# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DEMOND RUSSELL,<br><br>   Petitioner,<br><br>   v.<br><br>FREDRIC FOULK,<br><br>   Respondent. | Case No.  1:14-cv-00685-GSA-HC<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT, AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITUY<br><br>(ECF No. 1) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent is the Warden of High Desert State Prison.  He is represented in this action by William Kim, Esq., of the California Attorney General's Office. Both parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### I.

### BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) pursuant to an August 4, 2011, judgment of the Superior Court of California, County of Kern, following his conviction by jury trial of two counts of attempted first degree robbery, three counts of assault with a deadly weapon, two counts of second degree

robbery, one count of possession of a firearm by a convicted felon, and one count of active participation in a criminal street gang.  (Answer at 6, ECF No. 17).[1]  The jury also found true enhancement allegations that Petitioner personally used a firearm during the second degree robbery and gang participation offenses, and a gang enhancement.  (Answer at 6-7).  He was sentenced to serve a term of 38 years and eight months.  (Answer at 7).

On March 19, 2013, the California Court of Appeal, Fifth Appellate District, affirmed the judgment.  (Answer, Ex. A).  Petitioner then filed a petition for review in the California Supreme Court.  (LD[2] 5).  On June 12, 2013, the petition was summarily denied.  (LD 5).

On May 5, 2014, Petitioner filed the instant federal petition for writ of habeas corpus in this Court.  The Petition presents the following three grounds for relief: (1) The trial court violated Petitioner's due process rights by not allowing him to display his tattoos on his arms unless he waived his constitutional right to remain silent; (2) There is insufficient evidence to support his conviction for personally using a firearm during the robberies in count seven and eight; and (3) There is insufficient evidence to support his conviction for personally using a firearm while actively participating in a criminal street gang.  (Pet. at 8-17).  Respondent filed an answer to the petition on September 11, 2014.  (ECF No. 17).  Petitioner filed a traverse on October 14, 2014.  (ECF No. 19).

**II.**

**STATEMENT OF FACTS[3]**

**A.  Prosecution Evidence**

> On the night of October 27, 2010, Sidney Maiden picked up his cousins Stephan Cartwright and Russell in a stolen green minivan. They travelled to a bank on Oswell Street in Bakersfield where they attempted to rob two people at a drive-through automated teller machine. Next they went to La Mina Restaurant, located nearby on Auburn Street, where two of the men accosted Marilyn Aldana and Laura Sanchez in the parking lot and stole their purses

---

[1] Page numbers refer to the ECF page numbers.
[2] LD refers to the documents lodged by Respondent on September 11, 2014.
[3] The Fifth District Court of Appeal's summary of the facts in its March 19, 2013, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

at gunpoint.

Ms. Sanchez called 911 to report the robbery. She described the perpetrators as black males driving in a green van, one of whom was wearing a red shirt.

Russell and Stephan Cartwright were apprehended a few hours later at the home of Russell's sister. Sidney Maiden was arrested at a separate location. Police searched Russell's sister's residence and found a semi-automatic handgun, as well as personal property belonging to Ms. Aldana and Ms. Sanchez. Ms. Aldana and Ms. Sanchez subsequently identified Russell from a police line-up as one of the men who had robbed them.

Russell was wearing a red shirt at the time of his arrest. While in custody, he waived his Miranda2 rights and participated in a police interview that was recorded by an investigating officer, Nicole Shihrer. Russell admitted being present during the robbery at La Mina Restaurant and confirmed he had been wearing the same red clothing. He acknowledged that Stephan Cartwright and Sidney Maiden were members of the Bloods street gang, but denied being a member himself.

At trial, the prosecution's case-in-chief included testimony by five eyewitnesses, two investigating officers from the Bakersfield Police Department, and a police expert on criminal street gangs. Officer Shihrer authenticated the audio recording of Russell's police interview which was played for the jury in its entirety.

Officer Shihrer testified regarding Russell's physical appearance and clothing on the night of his arrest. Russell was the only one of the suspects arrested wearing a red shirt. She also testified that Russell had "bright red" tattoos of the words "royalty" and "loyalty" on his forearms.

During the examination of Officer Shihrer, defense counsel requested that Russell be allowed to "uncover his arms and show the jury his tattoos." The trial court ruled that such a display would be testimonial, subjecting Russell to cross-examination. The court invited defense counsel to instead provide the jury with photographs of the tattoos. Multiple photographs of Russell's tattoos were admitted into evidence during the defense case-in-chief.

The prosecution's gang expert was Bakersfield Police Officer Travis Harless. Officer Harless testified that the Bloods are a street gang engaged in an ongoing pattern of criminal conduct in Bakersfield. He described the gang's primary activities as including "theft-related crimes such as burglary, auto theft, carjacking [and] robbery," and explained that Bloods identify with the color red.

Officer Harless obtained background information about Russell through the Criminal Justice Information System. Officer Harless testified at length regarding his review of booking information and police reports from more than fifteen different investigations and

arrests for theft-related crimes involving Russell. In several instances, Russell had been wearing red clothing and/or associating with known gang members.

Based upon his criminal history and prior admissions of gang affiliation, Officer Harless opined that Russell was a member of the Bloods street gang. His red tattoos and frequent choice of red clothing "strengthened" Officer Harless's opinion. Officer Harless likewise opined that Stephan Cartwright and Sidney Maiden were Bloods members.

Concerning the robberies at La Mina Restaurant, victims Marilyn Aldana and Laura Sanchez identified Russell in court as the gunman. On cross-examination, both women testified that Russell pointed a gun at them with his right hand while using his left hand to take their purses. The defense later argued that this scenario was impossible because Russell is physically incapable of moving his left arm.

Russell's aunt, Ethel Mae Rincon, testified as a defense witness. According to Ms. Rincon, Russell had been in a car accident several years ago which caused his left arm to become paralyzed. She denied having any knowledge of Russell's involvement in gang related activities and said she did not believe he was a member of the Bloods.

(Answer, Ex. A).

### III.

### DISCUSSION

#### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is

1 therefore governed by its provisions.

2     **B.**    **Standard of Review**

3     Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

4 barred unless a petitioner can show that the state court's adjudication of his claim:

5

6     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

8     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

9

10 28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 131 S.Ct 770, 783-84, 178 L.Ed.2d 624

11 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

12     As a threshold matter, this Court must "first decide what constitutes 'clearly established

13 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at

14 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what "clearly established Federal law is"

15 this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions

16 as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

17 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

18 set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

19 the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

20 principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

21 . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

22 review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

23 Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

24 Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

25 end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

26 at 126; Moses, 555 F.3d at 760.

27     If the Court determines there is governing clearly established Federal law, the Court must

28 then consider whether the state court's decision was "contrary to, or involved an unreasonable

1  application of," [the] clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72 (quoting 28

2  U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ

3  if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

4  question of law or if the state court decides a case differently than [the] Court has on a set of

5  materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at

6  72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

7  in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's

8  Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be

9  contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

10  contradicts the governing law set forth in [Supreme Court] cases." <u>Id</u>.  If the state court decision

11  is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed

12  under the pre-AEDPA de novo standard.  <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en

13  banc).

14      "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

15  the state court identifies the correct governing legal principle from [the] Court's decisions but

16  unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at

17  413.  "[A] federal court may not issue the writ simply because the court concludes in its

18  independent judgment that the relevant state court decision applied clearly established federal

19  law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411;

20  <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility

21  fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

22  Court's] precedents." <u>Harrington</u>, 131 S.Ct. at 784.  In other words, so long as fairminded jurists

23  could disagree on the correctness of the state courts decision, the decision cannot be considered

24  unreasonable.  <u>Id</u>.  If the Court determines that the state court decision is objectively

25  unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

26  error had a substantial and injurious effect on the verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619,

27  637 (1993).

28      Petitioner has the burden of establishing that the decision of the state court is contrary to

6

1   or involved an unreasonable application of United States Supreme Court precedent.  <u>Baylor v.</u>

2   <u>Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

3   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

4   state court decision is objectively unreasonable.  <u>See</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669

5   (9th Cir. 2000); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999).

6       The AEDPA requires considerable deference to the state courts.  "[R]eview under §

7   2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

8   the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."

9   <u>Cullen v. Pinholster</u>, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations

10  by state courts are presumed correct absent clear and convincing evidence to the contrary."

11  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a

12  state court factual finding is not entitled to deference if the relevant state court record is

13  unavailable for the federal court to review.  <u>Townsend v. Sain</u>, 372 U.S. 293, 319 (1963),

14  <u>overruled by</u>, <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992).

15      **C.    Review of Claims**

16          1.    <u>Live Exhibition of Tattoos</u>

17      Petitioner argues that the trial court committed reversible error when it did not permit him

18  to display tattoos on his arms to the jury unless he subjected himself to cross-examination.

19      This claim was presented on direct appeal to the Fifth District Court of Appeal and was

20  denied in a reasoned decision.  Petitioner presented this claim in a petition for review before the

21  California Supreme Court.  The California Supreme Court summarily denied the petition on June

22  12, 2013.  Federal courts review the last reasoned state court opinion.  <u>Ylst v. Nunnemaker</u>, 501

23  U.S. 979, 803 (1991).  Therefore, the Court must review the opinion of the Fifth District Court of

24  Appeal.

25      In rejecting Petitioner's claim, the appellate court stated as follows:

26          "The improper exclusion of evidence is subject to a harmless error
            analysis." (*People v. McDowell* (2012) 54 Cal.4th 395, 434.) If
27          such exclusion does not infringe upon a defendant's constitutional
            rights, the error is reviewed under the standard of prejudice
28          adopted in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson* ).

7

(*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 (*Fudge* ).) Under *Watson,* a defendant must show it is reasonably probable that a more favorable result would have been obtained but for the error. (*People v. Mena* (2012) 54 Cal.4th 146, 162, citing *Watson, supra,* at p. 836.)

Errors of a constitutional dimension are evaluated under the standard established in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman* ). (*Fudge, supra,* 7 Cal.4th at p. 1103.) The *Chapman* test requires the reviewing court to determine " 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.) Undermining a criminal defendant's right not to testify, as Russell alleges in this case, may rise to the level of constitutional error. (See *People v. Lawson* (2005) 131 Cal.App.4th 1242, 1249, fn. 7; *People v. Cuccia* (2002) 97 Cal.App.4th 785, 791.) We need not decide whether the *Chapman* or *Watson* standard applies in this instance because the denial of Russell's proposed exhibition of his tattoos was harmless under either standard.

**2. The Gang Findings Were Supported By Substantial Evidence Apart From Any Consideration of the Tattoos.**

Russell submits that the jury's gang findings resulted "directly from the erroneous refusal to let him display his tattoos." He reasons that without testimony about the color of his tattoos (and his presumed ability to refute such testimony), the jury would have (1) rejected the notion that he was a member of the Bloods street gang and (2) concluded that the underlying crimes were not gang related, but merely committed by "a group of outlaw cousins." These arguments are not persuasive.

**(a) The Substantive Gang Offense (§ 186.22, subd. (a))**

Section 186.22 contains a substantive offense which punishes "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang ...." (§ 186.22, subd. (a).) The elements of the offense are: "First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez* ).)

The second element is not in dispute. The prosecution's gang expert provided ample testimony regarding the existence of the Bloods street gang and typical patterns of criminal activity by its members, including the crimes at issue. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 609 [expert testimony is relevant and admissible to prove the elements of substantive gang crimes and

gang enhancements].) Russell likewise admitted his familiarity with the Bloods gang during his police interview.

With regard to the first and third elements, Russell insists he has never been a gang member and that the evidence at trial did not prove otherwise. Membership, however, is not a required element of active participation in a criminal street gang. (§ 186.22, subd. (i); *In re Lincoln J.* (1990) 223 Cal.App.3d 322, 330, fn. 4.) Active participation refers to behavior that goes beyond nominal or passive involvement with a gang. (*People v. Castenada* (2000) 23 Cal.4th 743, 747 (*Castaneda* ).)

The first element can be established through evidence of crimes committed with other gang members, historical contacts with a particular gang, and admissions of gang association. (See, e.g., *Castenada, supra,* 23 Cal.4th at p. 753.) The prosecution's gang expert based his opinions on all of these factors, and also considered Russell's affinity for red clothing, which he wore while committing the concurrently charged felonies. Russell admitted that his cousins were Bloods and spoke to police about his associations with them and other members of the gang.

The third element requires that the defendant willfully advance, encourage, contribute to, or assist in felonious criminal conduct by gang members. (*Rodriguez, supra,* 55 Cal.4th at p. 1132.) Russell does not challenge his felony convictions for second degree robbery and attempted first degree robbery. These crimes were committed with two acknowledged members of the Bloods street gang, Stephan Cart-wright and Sidney Maiden.

Notwithstanding the convictions, Russell's statements to police supported the inference that he willfully aided and abetted felonious conduct by gang members. He acknowledged being present during the robbery at La Mina Restaurant, circling the parking lot and "scoping it out." The jury could have fairly interpreted this as an admission of reconnoitering and/or standing watch for his cousins. Russell also made incriminating statements regarding property which the gang members stole from their victims: "I just want to know what they gypped me out of[,] 'cuz I didn't get no money."

The foregoing evidence established each element of the substantive gang offense. The evidence was substantial, i.e., reasonable, credible, and of solid value from which a reasonable trier of fact could find Russell guilty beyond a reasonable doubt. (*People v. Albillar* (2010) 51 Cal.4th 47, 54, 59–60 (*Albillar* ) [substantial evidence standard applies to gang offenses and enhancements under section 186.22].) The additional tattoo evidence was not essential to the jury's verdict.

**(b)** *The Gang Enhancement Findings (§ 186.22, subd. (b)(1))*

The gang enhancement is defined in section 186.22, subdivision (b), which provides for increased punishments if two elements are present. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322

(*Villa-lobos* ).) The prosecution must establish the underlying crime was "[1] committed for the benefit of, at the direction of, *or in association with* any criminal street gang, [2] with the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1), italics added.) As with the substantive offense under subdivision (a), member-ship in a gang is not required. (*Albillar, supra,* 51 Cal.4th at pp. 67–68.)

Russell was associating with gang members when he committed the predicate offenses in this case. In light of the expert witness testimony and surrounding circumstances, including Russell's red clothing, it was rational for the jury to conclude that the crimes were gang related. (See *People v. Morales* (2003) 112 Cal.App.4th 1176, 1179, 1198 [evidence defendant knowingly committed the charged crimes with two gang members was sufficient to support the jury's true findings under section 186.22, subd. (b)(1) ].) This conclusion is not invalidated simply because the gang members also happened to be Russell's relatives.

For the second prong of the enhancement, the jury needed to look no further than the underlying robbery offense for which Russell was convicted. "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the com-mission of the crime." (*Villalobos, supra,* 145 Cal.App.4th at p. 322.) Russell's commission of the predicate offenses in concert with known gang members was established by the time the jury considered the gang enhancement allegations. Evidence of Russell's red tattoos may have been relevant to those allegations, but was superfluous.

**3. Prohibiting Live Exhibition of Russell's Tattoos Did Not Affect the Jury's Verdict.**

In arguing for reversal, Russell likens this case to *United States v. Bay* (9th Cir. 1984) 762 F.2d 1314 (*Bay* ). There, the defendant wanted to show the jury certain "conspicuous tattoos" on his hands to argue that the failure of prosecution witnesses to notice or mention the tattoos during their testimony raised a reasonable doubt about their identifications of him as the perpetrator. (*Id.,* at p. 1315.) The trial court ruled that such an exhibition would require the defendant to submit to cross-examination. The Ninth Circuit re-versed and remanded, holding that the tattoos were not testimonial evidence and, with proper foundation, would be admissible without requiring the defendant to take the witness stand. (*Id.* at pp. 1315–1316.)

This case is distinguishable from *Bay* in several respects. The *Bay* defendant's tattoos were "potentially exculpatory" given that eyewitness identification testimony was the only evidence supporting two of the charges against him. (*Bay, supra,* 762 F.2d at p. 1316.) Here, Russell's tattoos were not germane to the victims' identification of him and represented a small component of the larger body of evidence offered in support of the gang allegations.

More importantly, the record does not indicate that a live display of Russell's tattoos would have had any exculpatory value. We reject his assertion that the color of his tattoos was a "highly disputed issue" at trial. Defense counsel never denied that Russell's tattoos were red, nor did he dispute the accuracy of police testimony on that subject. The defense attorney's objection during the examination of Officer Shihrer was made on grounds that "if [the officer] hasn't seen those tattoos, her testimony is hearsay and ... should be stricken ..." FN3

> FN3. There was no merit to this objection. Officer Shihrer testified that she had seen Russell's tattoos and thus had personal knowledge of their appearance. Her testimony was not offered for the truth of any matter asserted by the tattoos themselves, i.e., the words "royalty" and "loyalty." (See Evid. Code § 1200, subd. (a).)

Further, Russell's ability to present evidence of his tattoos was not entirely contingent upon a waiver of his Fifth Amendment right not to testify. (See *Bay, supra,* 762 F.2d at p. 1316.) The trial court allowed him to submit photographs of the tattoos in lieu of a live exhibition. The prosecution had already photographed the tattoos at the beginning of trial and the defense attorney had an opportunity to take any additional pictures he wished to present to the jury.

Defense counsel introduced fourteen photographs of Russell's various tattoos into evidence. At least six of those photographs showed his left and right fore-arms from different angles and included "close up" images of the tattoos in question. The defense did not comment on these photographs to the jury and neither party made any mention of the tattoos during their respective closing arguments. Under these facts and circumstances, Russell's ability to submit photographic evidence of his tattoos served as an adequate substitute for a live, in-court exhibition. It cannot be said that the trial court's denial of Russell's request for the latter had a material impact on the verdict under any standard of prejudice. (*Watson, supra,* 46 Cal.2d at p. 836; *Chapman, supra,* 386 U.S. at p. 24.)

(Answer, Ex. A at 4-7).

The Fifth District Court of Appeal found that the trial court had committed an error when it found that Petitioner's display of his tattoos would be testimonial for purposes of the Fifth Amendment privilege against self-incrimination.   (Answer, Ex. A at 3).   However, the Fifth District Court of Appeal found that the exclusion of evidence was a harmless error that did not require reversal.  (Answer, Ex. A at 3-6).

Even if this Court determines that the state court decision is objectively unreasonable,

1   and the error is not structural, habeas relief is nonetheless unavailable unless the error had a

2   "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S.

3   at 637.  This Court does not have to apply the AEDPA/Chapman standard for the state court's

4   harmlessness determination, because it is subsumed within the Brecht test.  Pulido v. Chrones,

5   629 F.3d 1007, 1012 (9th Cir. 2010) (quoting Fry v. Pliler, 551 U.S. 112, 120-22 (2007)).

6       Petitioner argues that the trial court's decision not to allow him to conduct a live

7   exhibition of his tattoos was not a harmless error, because the only evidence to support the gang

8   enhancement and substantive gang offense was the testimony about the "bright red" ink of his

9   tattoos.  Petitioner asserts that Officer Shinrer's testimony that Petitioner's tattoos are "bright

10  red," and Officer Harless's testimony that Petitioner has two "red" tattoos as part of his opinion

11  that Petitioner was a member of the Bloods gang were important statements that the jury relied

12  on to find that Petitioner was a member of the Bloods gang.  Petitioner presented the defense that

13  he was not a member of the Bloods gang, and he was only associating with his codefendants

14  because they were his family members, and not because they were members of the Bloods gang.

15  (4RT 640-41).  Petitioner asserts that if the jury was able to see the tattoos on his arms through a

16  live exhibition, it would have decided that his tattoos are not gang-related, and found him not

17  guilty of the substantive gang offense and the gang enhancement.

18      Respondent argues that although the trial court erred in not permitting Petitioner to

19  conduct a live exhibition of his tattoos, there was no substantial and injurious effect on the jury's

20  verdict.  Respondent argues that there was substantial evidence to support the substantive gang

21  offense and gang enhancement even without Petitioner's tattoos, and that Petitioner had the

22  opportunity to present photographs of his tattoos to the jury.  Thus, this Court must consider

23  whether the trial court's denial of Petitioner's request to conduct a live display of his tattoos had

24  a substantial and injurious effect on the jury's verdict.  See Brecht, 507 U.S. at 637

25      Cal Penal Code 186.22(a)'s defines the substantive gang offense as "[a]ny person who

26  actively participates in any criminal street gang with knowledge that its members engage in or

27  have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or

28  assists in any felonious criminal conduct by members of that gang."  Therefore, the elements of

1   the substantive gang offense are: "First, active participation in a criminal street gang, in the sense

2   of participation that is more than nominal or passive; second, knowledge that the gang's members

3   engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion,

4   furtherance, or assistance in any felonious criminal conduct by members of that gang." People v.

5   Rodriguez, 55 Cal.4th 1125, 1130 (2012).

6        Cal. Penal Code § 186.22(b)(1)'s gang enhancement may only be applied if the

7   prosecution proves the following two elements beyond a reasonable doubt: (1) that Petitioner

8   committed a felony "for the benefit of, at the direction of, or in association with any criminal

9   street gang," and (2) that he did so "with the specific intent to promote, further, or assist in any

10  criminal conduct by gang members."

11       To sustain the imposition of a gang enhancement pursuant to Cal. Penal Code §

12  186.22(b)(1), "there must have been evidence upon which a rational trier of fact could find that

13  [a defendant] acted with the 'specific intent to promote, further, or assist in' some type of

14  'criminal conduct by gang members,' which may include the crimes of conviction." Emery v.

15  Clark, 643 F.3d 1210, 1216 (9th Cir. 2011) (quoting Cal. Penal Code § 186.22(b)(1)).  The

16  mental element of the gang enhancement requires substantial evidence from which the jury can

17  infer that in committing the gang-related criminal act, defendant specifically intended to engage

18  in or promote criminal gang conduct.  People v. Albillar, 51 Cal.4th 47, 68, 119 Cal.Rptr.3d 415,

19  432 (2010).  A finding of specific intent requires a subjective desire.  See 1 Witkin & Epstein,

20  Cal. Criminal Law (3d ed. 2000) Elements, § 5, p. 204.  However, "[i]ntent is rarely susceptible

21  of direct proof and usually must be inferred from the facts and circumstances surrounding the

22  offense." People v. Pre, 117 Cal.App.4th 413, 420 (2004).

23       In Abillar, the California Supreme Court found that "[t]here is no statutory requirement

24  that this 'criminal conduct by gang members' be distinct from the charged offense, or that the

25  evidence establish specific crimes the defendant intended to assist his fellow gang members in

26  committing." Albillar, 51 Cal.4th at 66 (citing People v. Hill, 142 Cal.App.4th 770, 774 (2006).

27       In this case, the Fifth District Court of Appeals found that the record didn't indicate that a

28  live display of Petitioner's tattoos would have had any exculpatory value.  Although Petitioner

now asserts that his tattoos aren't red, defense counsel never made those assertions during trial. Petitioner had the opportunity to present photographs of his tattoos to the jury, and, in fact, presented fourteen photographs of his tattoos to the jury. Petitioner had the opportunity to present additional photographs of his tattoos. Petitioner has failed to show how the jury's decision would have been different if the jury had seen a live display of Petitioner's tattoos instead of the photographs. Petitioner's argument that the trial judge had remarked that the tattoos did not appear "red" in the photographs does not provide sufficient support for his argument that a live display instead of the photographs would have had an effect on the jury's decision. The jury was able to view the photographs of Petitioner's tattoos and the color of Petitioner's tattoos was not a highly disputed issue in this case. In addition, identifications of Petitioner by the victims were not contingent upon any tattoos.

Although Petitioner argues that there was insufficient evidence for the substantive gang offense because there was no evidence that he was a member of the Bloods gang, the prosecution did not have to prove that Petitioner was an actual member of a gang, just that he was an active participant of a gang. See § 186.22(i). There was sufficient evidence presented that Petitioner did more than passive or nominal acts for a gang, because there was evidence that Petitioner associated with his cousins who were Bloods and other members of the Bloods, and wore red clothing while committing the instant robberies. Therefore, there was sufficient evidence that Petitioner was an active participant of a gang within the definition of the substantive gang offense. There was sufficient evidence by the prosecution's gang expert about the existence of the Bloods gang and their typical criminal activity. As to the third element of the substantive gang offense, Petitioner did not contest his convictions for the robberies. There was evidence that Petitioner had circled the parking lot of La Mina Restaurant and scoped it out, and was present at the time of the robberies which he committed with two Bloods members. Therefore, there was sufficient evidence that Petitioner willfully advanced, encouraged, contributed to, or assisted in felonious conduct by gang members. Thus, there was sufficient evidence without the tattoo evidence that Petitioner committed the substantive gang evidence.

As to the gang enhancement, there was sufficient evidence that Petitioner specifically

intended to "assist in" criminal conduct (robbery) by known gang members (Maiden and Cartwright) within the meaning of section 186.22(b)(1).  There was sufficient evidence that Petitioner committed the robberies for the benefit of, at the direction of, or in association with the Bloods gang, because Petitioner, Cartwright, and Maiden came together to commit the robbery in association with each other and it is uncontested that Petitioner knew of his two codefendants' gang affiliation.  Additionally, Officer Harless's testimony provided sufficient proof that robberies constituted a primary activity of the gang.  Therefore, there was sufficient evidence without the tattoo evidence to support the gang enhancement.

Thus, the error did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Accordingly, this claim must be denied.

### 2. Insufficient Evidence to Support Personal Firearm Use Enhancement

Petitioner alleges that there was insufficient proof to find that he personally used a firearm as to counts 7 (robbery of Aldana), 8 (robbery of Sanchez), and 12 (active participation in a street gang).  This claim was presented on direct appeal to the Fifth District Court of Appeal and it was denied in a reasoned decision.  Petitioner then presented this claim in a petition for review to the California Supreme Court.  The California Supreme Court summarily denied the petition.  Federal courts review the last reasoned state court opinion.  Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  Therefore, the Court must review the opinion of the Fifth District Court of Appeal.  In rejecting Petitioner's claim, the appellate court stated as follows:

> The jury found true enhancement allegations that Russell personally used a firearm within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b). These findings were based on the testimony of Marilyn Aldana and Laura Sanchez, i.e., the women who were robbed in the parking lot of La Mina Restaurant. Citing the alleged paralysis of his left arm, Russell insists that the testimony of both victims was physically impossible and/or inherently improbable. Assuming that his left arm was in fact paralyzed, we conclude that the doctrines of physical impossibility and inherent improbability do not apply. Regardless of how this court might interpret the evidence, the jury's verdict must be affirmed under the controlling standard of review.

> **1. Relevant Trial Testimony and Evidence**

> Marilyn Aldana testified on direct examination that she and Laura Sanchez were accosted by two males in the parking lot of La Mina

Restaurant. As she was sitting in her car, one of the men leaned in through the open passenger door window and pointed a gun at her. The gunman demanded that she give him her purse. She complied by handing the purse over to him.

Ms. Aldana recalled that the gunman was wearing a red shirt underneath what appeared to be a blue sweater. When asked about the gunman's accomplice, the witness testified that she "really couldn't see him very well." A few hours later, after the suspects were arrested, Ms. Aldana identified Russell from a police line-up. At trial, she identified Russell in the courtroom as the man who had robbed her at gunpoint: "He was the guy with the gun."

Ms. Aldana was questioned on cross-examination about certain details of the robbery. She could not recall which hand Russell had used to hold the gun. Defense counsel then asked her to confirm the following sequence of events:

"Q. Okay. So he's holding the gun; right? Yes?

"A. Yes.

"Q. And then you hand him the purse? Yes?

"A. Yes.
"Q. And he grabbed it?

"A. Yes.

"Q. With his other hand, because he's holding a gun in one hand; right?

"A. Right."

Later, at his attorney's direction, Russell performed a physical demonstration which suggested he was incapable of moving his left arm. Following this demonstration, Ms. Aldana was again asked to confirm that Russell had used two hands during the robbery; one to hold the gun and the other to grab the purse. Ms. Aldana stated that she did not recall one way or the other. As defense counsel pressed the issue, she repeatedly testified that she could not remember those details.

At one point, Ms. Aldana explained: "I can't state what hand— what hand he did have the gun in, but I do know that he had the gun in the car pointed at me, asking me to give him my purse.... It took me a while to kind of just comprehend what was happening, until I did decide to hand him my purse. I can't say he reached in with two hands. I just know I handed [him] the purse. He could have grabbed it with one hand or two hands." Defense counsel persisted with the same line of questioning until the following exchange took place:

"Q. And now you're under oath; right?

"A. Yes.

"Q. Okay. Now, the man who pointed the gun at you that night pointed the gun with one hand; is that right?

"A. Yes.

"Q. And then you handed him the purse, and he grabbed it with the other.

"A. (Pause in the proceedings.) I want to say yes.

"Q. No further questions of this witness."

Laura Sanchez was exiting her vehicle when two males ran up from behind her in the restaurant parking lot. One of the men pointed a gun in her face, touching it to her chin, and demanded that she give him her purse. Ms. Sanchez handed her purse over and watched as the gunman proceeded to rob Marilyn Aldana in the same fashion. She confirmed that the man with the gun committed both robberies while his accomplice stood nearby.

Ms. Sanchez testified that both men had been wearing blue sweaters or "hoodies" and that she recalled seeing a red shirt. She noted, however, that she did not have a clear recollection of what the men were wearing because seven months had passed since the robbery. As with Marilyn Aldana, Ms. Sanchez had previously identified Russell during a police line-up.

At trial, Ms. Sanchez identified Russell in court as the man who had robbed her. She specifically identified him as the gunman. When the prosecutor asked, "Why do you say that?" she replied, "His face. I remember his face when he approached me."

Defense counsel cross-examined Laura Sanchez with a series of questions similar to those asked of Marilyn Aldana. The relevant exchange went as follows:

"Q. All right. All right. Now, at some point you handed him your purse; correct?

"A. Yes.

"Q. Now, so he's holding the gun in one hand, and then did you toss the purse to him?

"A. No. I handed it to him.

"Q. So—So he's holding the gun, and then you hand him the purse; is that right?

"A. Yes.

"Q. With—and he grabbed it with the other hand; right?

"A. Right."

Defense counsel moved on to other topics after eliciting the above testimony. With regard to the perpetrators' clothing, Ms. Sanchez testified that she believed it was the accomplice, rather than the gunman, who had been wearing a red shirt under his sweater or "hoodie." She was then asked if she was certain it was Russell who had used a gun during the robbery. Ms. Sanchez responded: "Yeah, 'cause I remember his side, like his face, his bone structure ... Just the way he looked."

**2. Standard of Review**

A jury's findings are reviewed for substantial evidence. (*People v. Superior Court* (*Jones* ) (1998) 18 Cal.4th 667, 681.) "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. [Citation.] Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

Reversal is not warranted unless the evidence is insufficient to support the verdict under any hypothesis. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The appellate court cannot reweigh the evidence, reinterpret the evidence, or substitute its judgment for that of the jury. (*People v. Baker* (2005) 126 Cal.App.4th 463, 469.) "If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

**3. The Jury's Findings Were Not Based Upon "Physically Impossible" or "Inherently Improbable" Testimony.**

The enhancement allegations at issue are satisfied when a defendant is found to have displayed a firearm in a menacing manner during the commission of a felony, and specifically robbery under section 12022.53, subdivision (b). (§ 12022.53, subd. (a)(4); CALJIC No. 17.19; see also, *People v. Johnson* (1995) 38 Cal.App.4th 1315, 1319 [discussing § 12022.5, subd. (a) ].) The robbery victims in this case testified that Russell pointed a gun at them during the commission of those crimes. If accepted as true, their testimony would constitute substantial evidence to support the enhancements.

We note first that the testimony given on direct examination by Marilyn Aldana and Laura Sanchez was not physically impossible. Even with a paralyzed left arm, Russell was capable of using his right arm to point a handgun in the manner described by both witnesses. There are also multiple scenarios in which Russell could have taken control of the victims' purses while still holding the firearm in his right hand. For example, he could have slipped his

right hand and forearm through the straps of the purse as it was handed to him, or he could have grasped the straps or the purse itself with his third, fourth and/or fifth fingers while still maintaining control of the gun.

The thrust of Russell's argument is that the victims' testimony was so badly broken down on cross-examination as to render it "inherently improbable" and unworthy of belief. This is a difficult standard to satisfy. It has been said that a reversal on grounds of inherently improbable evidence is "so rare as to be almost nonexistent." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728 (*Ennis* ).)

The doctrine of inherent improbability addresses the basic content of a witness's testimony. (*Ennis, supra,* 190 Cal.App.4th at p. 729.) "The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?" (*Ibid.*) The wholesale rejection of a witness's statements as inherently improbable requires " ' " 'either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 124.)

Russell relies on testimony given by Ms. Aldana and Ms. Sanchez on cross-examination which cannot be reconciled with the alleged paralysis of his left arm. The problem with this argument is that the jury was free to reject some parts of the witnesses' testimony while still believing the other parts. (*People v. Langley* (1974) 41 Cal.App.3d 339, 348 ["[T]he trier of fact may reject a part of the testimony of a witness while believing other portions of his testimony."]; see also, *People v. Jones* (1984) 155 Cal.App.3d 153, 168 [jury may believe a witness's testimony on direct examination and reject any inconsistencies that surface on cross-examination].) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Thornton* (1974) 11 Cal.3d 738, 754, disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 685, fn. 12.)

Both witnesses were confident in their identification of Russell as the gunman because they remembered the appearance of his face. Marilyn Aldana testified that she "really couldn't see" the other man, Russell's accomplice, from the inside of her car. It is entirely possible that the jury was convinced by the facial recognition testimony, yet found the witnesses' answers on cross-examination to be unreliable in terms of remembering which hand was used to grab their purses. This conclusion is strengthened by the fact that the jury was made fully aware of Russell's alleged physical disability, as it became the focal point of the defense's case-in-chief and closing argument.

Eyewitness identification testimony is sufficient to support a conviction unless the testimony is physically impossible or

1

2

3

4

inherently improbable. (*People v. Scott* (1978) 21 Cal.3d 284, 296; *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.) Neither exception applies in this case. The standard of review requires that the evidence most favorable to the respondent be accepted as true and the unfavorable evidence be "discarded as not having sufficient verity to be accepted by the trier of fact." (*In re Gustavo M., supra,* 214 Cal.App.3d at p. 1497.)

5

6

7

Russell was identified as the gunman by two eyewitnesses. The circumstances surrounding the identification were explored at length during trial. The jury weighed the evidence and accepted the identification as true. That determination is binding on this court. (*In re Gustavo M., supra,* 214 Cal.App.3d at p. 1497.)

8

(Answer, Ex. A at 6-10).

9

10

11

12

13

14

15

16

The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal habeas review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  This Court must determine whether the state decision was an unreasonable application of the Jackson standard.

17

18

19

20

21

22

23

24

25

26

27

28

Petitioner asserts that it was factually impossible that he was personally using the firearm during the robberies, because he has a limp left arm.  The Fifth District Court of Appeals determined that it was not physically impossible for Petitioner to have displayed a firearm during the robberies of Aldana and Sanchez, because Petitioner was capable of using his right arm to point a handgun in the manner described by both witnesses.  Both victims testified that they remembered that Petitioner was the gunman, and Sanchez testified that she remembered Petitioner because of the appearance of his face.  (RT 148-49, 173-75).  The state court's possible scenarios of Petitioner taking control of the victims' purses while still holding the firearm in his right hand even with a paralyzed left arm are reasonable.  Therefore, it was not factually impossible for Petitioner to commit the robberies while using a firearm.  Thus, viewing the evidence and inferences in the light most favorable to the prosecution, it was reasonable that any rational trier of fact could find that Petitioner personally used a firearm while committing the

robberies of Sanchez and Aldana.

Petitioner also argues that there was insufficient evidence to support the personal firearm use enhancement as to count 12, active participation in a criminal street gang.   Petitioner concedes that the evidence for the personal firearm use enhancement on count 12 was the same as the evidence for the personal firearm use enhancements on counts 7 and 8.  (Pet. at 11).  As previously stated, there was sufficient evidence to support the personal firearm use enhancements on counts 7 and 8.   Therefore, there was sufficient evidence to support the personal firearm use enhancement as to the substantive gang offense in count 12.

## IV.

## CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).   The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

>> (B) the final order in a proceeding under section 2255.

> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3) The certificate of appealability under paragraph (1) shall

indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## V.

## ORDER

Accordingly, this Court hereby ORDERS that:

1) The Petition for Writ of Habeas Corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment for Respondent and close the case; and

3) The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:  __December 11, 2014__          _____/s/ Gary S. Austin_____
                                        UNITED STATES MAGISTRATE JUDGE